UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Khalid Najimi, | ) | Case No. 14 B 33271 |
| | ) | |
| Debtor. | ) | Honorable LaShonda A. Hunt |
| | ) | |
| | ) | |
| Eby-Brown Company, LLC, | ) | |
| a Delaware Limited Liability Company, | ) | |
| | ) | Adversary No. 14 A 00859 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Khalid Najimi, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the court for ruling after a trial on the adversary complaint filed by plaintiff Eby-Brown Company, LLC ("Eby-Brown"), objecting to the dischargeability of a debt owed by defendant/debtor Khalid Najimi ("Najimi"), under 11 U.S.C. § 523(a)(2)(A) and § 523 (a)(6). Najimi owned Najimi Mini Mart, Inc. ("NMM"), a company that operated three mini-mart (gas station/grocery store) locations in Illinois. Eby-Brown sold goods to NMM for resale in the mini-marts; in turn, NMM agreed to pay invoices within 14 days of shipment. Najimi personally guaranteed the company's debts to Eby-Brown. After NMM defaulted on payments, Eby-Brown sued Najimi and NMM in state court. Najimi eventually sought voluntary bankruptcy relief under Chapter 7, thereby staying the state proceedings. For the reasons that follow, the court concludes

1

that Eby-Brown failed to meet its burden of establishing that Najimi intended to defraud or harm creditors.

## Procedural History

Eby-Brown alleges in its amended complaint that Najimi ordered goods on behalf of NMM for which he never intended to pay, and then transferred NMM's assets to a corporation set up in his wife's name to avoid collection efforts. Eby-Brown previously moved for summary judgment on the amended complaint; however, the motion was denied because genuine issues of material fact existed as to Najimi's intent. *Order Denying Motion for Summary Judgment*, Adv. Dkt. #101. The case proceeded to trial on January 15 and 16, 2019, and the parties submitted post-trial briefs on March 7, 2019. This decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052.

## Background

The following facts are drawn from the trial testimony and pre-trial stipulations. Most of the relevant details are undisputed. At issue is Najimi's motive and witnesses offered varying viewpoints at trial which the court must now assess. The parties' business relationship began in September 2012 when NMM acquired an existing mini-mart in Naperville and signed a credit and security agreement to purchase goods from Eby-Brown. Within months, NMM expanded to stores in Gridley in December 2012 and Barrington in January 2013. The Gridley location was older and much larger and nearly empty of inventory, while the Barrington location was newer but reopening after construction and thus had no inventory either. Similar credit and security agreements were executed with Eby-Brown for the additional locations. Najimi signed a personal guarantee for the business debts.

Between October 2012 and January 2013, NMM placed monthly orders totaling $5,315.99 in October, $57,298.53 in November, $85,450.56 in December, and $111,500.88 in January. The business used three separate checking accounts for gas, merchandise, and Lottery sales, although bank statements reflect regular transfers of funds between the accounts. Prior to March 2013, Eby-Brown invoices were paid as agreed through electronic fund transfers (EFT) from the merchandise account.

But starting in January 2013, for reasons that are not entirely clear in the record, NMM was having trouble paying creditors. The checking account statements show dishonored transactions from the gas account starting in late January, and then from all three accounts by late February. In early March, Eby-Brown received notice of rejected requests for transfers from the merchandise account. Najimi acknowledges that he was generally aware of NMM's financial difficulties and had ready access to banking account information. Still, he claims to have known very little about store operations or finances, as his assistant Naveed Ahmed ("Ahmed"), was in charge of ordering goods and managing the three stores. Najimi has a business degree and prior experience owning and running other small businesses. Nevertheless, he insisted, and his wife, Houda Fenzar, attested as well, that Najimi was busy driving a limousine to support their family, and therefore relied mainly on Ahmed to operate the stores.

Ahmed contradicted much of Najimi's testimony, stating instead that Najimi came to the mini-marts regularly, two to three times per week for several hours at a time, directed employees to order more goods, took cash from the business that he did not deposit into NMM bank accounts, and talked to Ahmed about filing for bankruptcy to deal with increasing debts. According to Ahmed, Najimi hired him as manager because he had prior gas station experience, but Najimi made it clear the relationship was not a partnership. Ahmed explained that he worked regular

3

shifts in the stores and Najimi, the sole owner and shareholder of NMM, was in charge. Najimi's accountant, Tim Hashlamoun, testified that Najimi was his sole contact for the businesses who provided all profit/loss information used to prepare the company tax returns.

Eby-Brown proceeded to trial on the theory that Najimi fraudulently procured goods for the mini-marts by placing significant orders in the month of February 2013 for $165,658.33, and the first week of March 2013 for $57,360.17, with no intention of paying for those products. The parties agree that Eby-Brown is still owed $173,772.72. To support its case, Eby-Brown presented two of its employees as witnesses, Kevin Stace, a credit manager, and Patrick Kelleher, an account representative, as well as Ahmed. Stace testified that the February and March orders represented an abnormal ramp-up of inventory that he typically sees when customers are struggling and planning to close their businesses. Kelleher described Eby-Brown's attempts in mid-March 2013 to retrieve its products from the stores after NMM failed to pay for those goods. Kelleher testified that Eby-Brown employees went to each location and were denied permission to remove merchandise from the shelves. Ahmed stated that Najimi was present at the Naperville store and instructed employees not to cooperate. Not surprisingly, Najimi denied any knowledge of or involvement in any of those incidents.

Finally, in March 2013, Najimi had Hashlamoun set up three new corporations in Fenzar's name to run each of the stores – A&D Mini-Mart, Ayah's Mini-Mart, and Dina's Mini-Mart. Fenzar testified that Najimi told her this was necessary because NMM had bad credit. Fenzar had no business experience, did not put any money into the stores, and visited the Naperville store only once. Hashlamoun confirmed that in early 2013, at Najimi's request, he prepared the incorporation paperwork for A&D, Dina's, and Ayah's for Fenzar to sign. After A&D was incorporated on March 18, 2013, Najimi transferred operation of the Naperville store from NMM to A&D for no

4

consideration. Najimi and Fenzar reported income from A&D on their joint tax returns in 2013, 2014, and 2015. Ahmed managed the Naperville location, operating as A&D, until 2015. Ayah's and Dina's were never used, since the landlord took back the Gridley and Barrington stores by summer 2013 after NMM missed several rent payments.

In April 2013, Eby-Brown filed suit against Najimi and NMM in state court to recoup its losses. Najimi subsequently filed for Chapter 7 bankruptcy protection in September 2014.

## Discussion

### A.    Jurisdiction

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) that seeks to determine the dischargeability of a debt.

### B.    Standards for Dischargeability

It is well established that the goal of the bankruptcy process is to give the "honest but unfortunate debtor" a fresh start. *Marrama v. Citizens Bank of Massachusetts*, 127 S.Ct. 1105, 1107 (2007). As such, debts are presumed dischargeable, and objecting creditors bear the burden of demonstrating nondischargeability by a preponderance of the evidence. *In re Strauss*, 523 B.R. 614, 625 (Bankr. N.D. Ill. 2014).

Eby-Brown contends that Najimi's debt should be excepted from discharge on two grounds: (1) section 523(a)(2)(A) for "actual fraud" and (2) section 523(a)(6) "for willful and malicious injury." *See* 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). Eby-Brown asserts that its burden of proof has been met here as the evidence establishes that Najimi intended to defraud and injure creditors. But after reviewing the evidence and assessing credibility of the key witnesses, the court disagrees.

5

C. **Actual Fraud (Count I)**

To prove "actual fraud" for purposes of section 523(a)(2)(A), Eby-Brown must show that Najimi was motivated by an intent to deceive. *See In re Hanson*, 437 B.R. 322, 327 (Bankr. N.D. Ill. 2010) ("At the heart of the exception to discharge under any of the prongs of § 523(a)(2)(A) is the element of intent."). This inquiry focuses on "the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct." *In re Glenn*, 502 B.R. 516, 532 (Bankr. N.D. Ill. 2016). "Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made." *Id.* However, courts can consider subsequent conduct to the extent that it "provides an indication of the debtor's state of mind at the time of the actionable representations." *Hanson*, 437 B.R. at 327. Furthermore, intent to deceive can be established through direct evidence or inference. *In re Sneed*, 543 B.R. 848, 862 (Bankr. N.D. Ill. 2015). Because direct proof is rarely available, fraudulent intent "may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Glenn*, 502 B.R. at 532 (internal quotations omitted).

Eby-Brown argues in its post-trial brief that the record is replete with evidence of fraudulent conduct by Najimi in furtherance of his scheme to obtain goods without payment. First, Eby-Brown asserts that Najimi was aware of NMM's cash flow issues in January 2013 and directed employees to increase orders in February and March 2013. Najimi offered contradictory explanations at trial on both points. At times, he claimed ignorance about the details of the business operations and insisted that Ahmed was solely responsible for all decisions. On the other hand, Najimi concedes that he visited the stores and regularly discussed with Ahmed the need to increase sales and profit as well as the ordering of goods. Most importantly, Najimi acknowledges

6

that he knew in January 2013, *before* the larger February and March orders were placed, that NMM was struggling financially and payments to suppliers were being rejected. Consequently, the decision to continue to not only order goods but also increase the request so significantly, according to Eby-Brown, was motivated by wrongful intent.

The court agrees that Najimi is not quite the innocent bystander that he attempts to portray himself as here. He is both educated with a business degree and an experienced entrepreneur. And as Hashlamoun's sole contact who provided the financial information needed to complete the tax returns of the businesses, Najimi clearly had an understanding of the inner workings of his companies. Najimi's inconsistencies on these basic but crucial details certainly calls into question his credibility in a case that turns on his intent. But those shortcomings do not doom his defense on this point, since regardless of who was responsible for placing the February and March orders, Najimi offered a plausible explanation to justify the need for additional products that is consistent with the evidence presented at trial.

NMM had acquired the Gridley and Barrington stores just a month or two earlier and each required a significant influx of inventory in order to stock the shelves. Indeed, NMM's orders had steadily increased from $5,315.99 in October 2012 to $57,298.53 in November 2012 for the Naperville store only, to $85,450.56 in December 2012 with the addition of Gridley, and then $111,500.88 in January 2013 as Barrington was acquired. Significantly, it is undisputed that those invoices were all paid in full and on time. Orders for goods definitely jumped in February 2013 to $165,658.33, but at that point, NMM was purchasing for three stores. The fact that NMM paid a portion of the February invoices until early March signals to the court a continued intention to comply with the terms of the credit agreement, not to stiff Eby-Brown on payments. Eby-Brown has not put forth any evidence to show that, in light of the timing of the acquisition of two

7

additional stores that were basically starting from scratch and NMM's consistent payment history until early March 2013, there was anything suspicious, let alone deceptive, about the steady increase in NMM's ordering pattern. Nor has Eby-Brown demonstrated that it was unreasonable for Najimi to believe that notwithstanding NMM's financial woes, the ordered goods would be sold and Eby-Brown repaid within 14 days.

Eby-Brown urges the court to consider Stace's testimony that the abnormal ramp-up from previous orders was consistent with fraudulent activity by customers planning to close their businesses. However, Stace's "opinion" is not only unreliable but also wholly unsupported by any factual basis to justify his conclusion that fraudulent intent as opposed to poor management, was the driving force behind the decisionmaking regarding order placement. Without a foundation for his belief about Najimi's motives, Stace's testimony is speculative and unpersuasive.

Second, Eby-Brown maintains that in March 2013, Najimi took sale proceeds from the stores and did not deposit them into NMM's bank accounts, instructed Ahmed not to pay Eby-Brown, discussed with Ahmed his plans to file for bankruptcy, and refused to allow Eby-Brown employees to retrieve product from the store shelves after defaulting on payments. The record is not clear as to exactly when these events occurred, but as far as the court can surmise, Eby-Brown is referring to conduct that likely occurred after NMM placed its final order in the first week of March. That means the court may consider these relevant details "that took place after the debtor incurred the debt if that conduct indicates the debtor's state of mind at the time" the goods were ordered. *In re Casali*, 547 B.R. 263, 271 (Bankr. N.D. Ill. 2016). The question, then, is whether those actions show that Najimi never intended to keep his promise to pay for goods within 14 days of shipment.

8

While it is true that NMM ordered over $57,000 in goods during the first week of March alone and deposited only $4,000 in proceeds for the entire month, that fact, standing alone, does not establish that *at the time* orders were placed at least 14 days earlier, there was no intent to repay the debt. In an attempt to bolster its case, Eby-Brown relies primarily on testimony from Ahmed who depicted Najimi as a naïve businessman duped into purchasing three unprofitable mini-marts *and* a dishonest owner siphoning cash from a failing business for his personal use instead of paying creditors. His assessment of Najimi's business acumen is borne out by the evidence in this case, as Najimi admits he knew nothing about running a mini-mart business and essentially relied on his employees to manage operations while he focused on his other business driving a limousine. The ill-fated expansion from one manageable store to two additional ones in need of a full restocking, occurring over two months, certainly reflects his inexperience. Given that NMM was generally paying its debts into early 2013, it appears those acquisitions may have been the tipping point for the company. The implication, though, is that by the time the February and March 2013 orders were placed, Najimi was desperately trying to salvage the business, not attempting to defraud Eby-Brown.

So even if Najimi diverted proceeds that should have been used to pay invoices, Eby-Brown has described nothing more than a clear breach of contract. In other words, Najimi and NMM failed to fulfill the contractual obligation to maintain sufficient funds in the merchandise account 14 days after shipment to cover the EFT for the amount due. But fraud requires proof of intent not to perform when the debt is incurred. "Broken promises to pay are just that, broken promises and not fraud," *Sneed*, 543 B.R. at 862, which is exactly what appears to have transpired here. Only if the promising party never had an intention to perform does this cross the line from breach of contract to fraud. *Id.* No such showing of that motive has been made by Eby-Brown.

Similarly, any discussions about possibly filing for bankruptcy does not evince an intent to defraud when goods were ordered. In fact, Najimi did not seek Chapter 7 relief until September 2014, well over a year *after* these debts were incurred and he was personally sued for non-performance along with a defunct NMM. Likewise, even if Najimi refused to allow Eby-Brown to collect its unpaid goods from the store, that has no bearing on Najimi's state of mind when the goods were ordered. Put another way, Najimi could have honestly intended to sell products and pay invoices within 14 days as he had been doing for months, but found himself unable or even unwilling to pay when the debt came due. Again, that is a contract breach. Far more than evidence of non-performance is needed to elevate the conduct to fraudulent. Moreover, any reluctance to allow a creditor to retrieve its products makes sense for a mini-mart that could not make money with bare shelves. Therefore, the refusal to return products could just as easily be attributed to a legitimate desire to generate funds to pay business debts as it could to an effort to intentionally deceive creditors and evade responsibility. *See Casali*, 547 B.R. at 271. Eby-Brown bears the burden of proof and on balance, the court finds that its attempt to connect subsequent conduct to fraudulent intent at the inception of the debt falls short.

Lastly, Eby-Brown asserts that in March 2013, Najimi transferred NMM operations to his wife's corporation, A&D, for no consideration. Najimi concedes that he set up A&D to run the Naperville location because NMM was no longer able to procure credit. Of all Eby-Brown's arguments, this one is the most compelling. Fraud is broadly defined to include "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated," *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000), and this conduct could certainly fall within those parameters. The timing is suspect, with A&D being incorporated less than a month after NMM received goods from Eby-Brown for which it still owed a significant portion of the balance. And the conduct is

questionable, no doubt. While Najimi claims his intentions were good and he was trying to keep the business running so that he could earn enough to repay Eby-Brown and other creditors, Ahmed counters that Najimi was scheming to avoid paying his debts.

While this is a closer question, after hearing the witnesses and seeing their demeanor on the stand, the court credits Najimi's testimony over Ahmed's. Overall, Najimi was a generally credible witness who, notwithstanding his management degree and prior experience running small businesses, came across as ill-equipped and unprepared to successfully operate these mini-marts. Ahmed, on the other hand, offered mostly self-serving testimony about Najimi's motives that contradicted his prior sworn statements in other proceedings. In fact, Ahmed was impeached at trial with an affidavit that he signed in May 2013 in Najimi's defense in the state court case. Around the time these events occurred, Ahmed averred that NMM increased its orders in February and March 2013 at the urging of Eby-Brown representatives but found itself unable to pay due to unexpected poor sales, rent and employee salaries/wages. After being confronted with the inconsistencies, Ahmed weakly attempted to backtrack on those statements by suggesting that he never read the affidavit and just signed whatever documents Najimi's lawyer placed in front of him. While Ahmed insists that his version of the facts today should be believed, the court remains unconvinced. Ahmed benefitted financially from the relationship with NMM as an employee and then continued to operate a profitable A&D at the Naperville location for two years thereafter. Ahmed's sudden about-face now that he is no longer employed by Najimi and strong conviction that Najimi was scheming to cheat Eby-Brown by stocking the shelves in order to set A&D up for success rings hollow.

To prevail on an actual fraud claim, Eby-Brown had to establish Najimi's intention at the outset to defraud or demonstrate that subsequent acts of trickery reflect a deceptive motive. The

evidence presented is not enough to prove by a preponderance of the evidence that Najimi acted wrongfully. Consequently, the standard required to except a debt from discharge under section 523(a)(2)(A) has not been satisfied.

**D.      Willful and Malicious Injury (Count II)**

Eby-Brown relies on the same conduct to prove that Najimi caused a "willful and malicious injury" for purposes of section 523(a)(6). As an initial matter, this court already ruled on summary judgment that debts based on fraud fall under section 523(a)(2)(A), not section 523(a)(6). *Order Denying Summary Judgment*, at 11. *See also In re Jahelka*, 442 B.R. 663, 671-72 (Bankr. N.D. Ill. 2010). But even if that were not the case, Eby-Brown's claim would still fail.

For purposes of section 523(a)(6), a willful injury must be intended. *See In re Scarpello*, 272 B.R. 691, 704 (Bankr. N.D. Ill. 2002) (explaining that willful "means intent to cause injury, not merely the commission of an intentional act that leads to injury"). If the result is a willful injury but not "the *intended* result of an intentional act, the debt arising from the injury is dischargeable." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012) (emphasis in original). Similarly, the test for maliciousness under section 523(a)(6) requires a wrongful act, done intentionally and without just cause and excuse, which causes injury to the creditor. *Scarpello*, 272 B.R. at 704.

Whether Eby-Brown proceeds under the willful or malicious prong, a subjective intent to cause injury is required. As this court has already held, *supra*, the evidence in the record does not support that finding against Najimi. Rather, the trial testimony established his good faith efforts to keep the stores running in order to repay Eby-Brown and other creditors. That Eby-Brown sustained a financial loss due to nonpayment of the February and March 2013 invoices is unfortunate but not enough to change what is essentially a breach of contract claim into an action

for intentional injury. Accordingly, Eby-Brown cannot rely on section 523(a)(6) to except its debt from discharge.

## **CONCLUSION**

For the foregoing reasons, judgment will be entered in favor of defendant/debtor Khalid Najimi on Counts I and II of the amended complaint and against plaintiff Eby-Brown Company, LLC. A separate judgment will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

DATED:  July 8, 2019

*/s/ LaShonda A. Hunt*
The Honorable LaShonda A. Hunt
United States Bankruptcy Judge